192 So.2d 205 (1966)
Marion KLEIN, Widow of Joseph W. TURNER, Individually and on Behalf of Her Minor Children, Beverly, Jean, Lana and Joan Turner,
v.
HOWARD MOTORS, INC. and American Employers Insurance Company.
No. 2331.
Court of Appeal of Louisiana, Fourth Circuit.
November 7, 1966.
*206 Bendana & McLaughlin, Orlando G. Bendana, New Orleans, for plaintiff and appellee.
O'Keefe, O'Keefe, Fedoroff & Varela, Gerald P. Fedoroff, New Orleans, for defendants and appellants.
Before YARRUT, SAMUEL and HALL, JJ.
YARRUT, Judge.
This is a suit by the widow, in her own behalf, and for her minor children, to recover workmen's compensation death benefits for the death of her husband and father of her children, at $35.00 per week for 400 weeks, or $14,000.00; plus $2,500.00 medical expenses; and the statutory 12% damages, plus attorney's fees, for Defendant's arbitrary and capricious refusal to make payment; for expert fees, and all taxable costs of court.
The district judge rendered judgment for 400 weeks at $35.00 per week, plus $600.00 funeral allowance, and expert fees of $100.00 for each doctor, plus all costs of court; but denied the statutory damages and attorney's fees.
The district judge in his written reasons clearly stated the facts and medical testimony, the essential part of which we quote, inter alia, and adopt, viz:
"Certain facts are uncontradicted: The deceased (aged 42) was an auto mechanic who was employed by Howard Motors, Inc., and as such was engaged continuously for the past five years as a mechanic, doing various jobs on automobiles at a weekly salary of $135.00 to $175.00. On the day in question deceased was engaged in his employment, and did perform certain light duties during the morning hours. Thereafter, about 3:00 P.M., he was requested by his foreman to, and he did, proceed with what has been referred to as a brake job. In performing that work, it was necessary that decedent handle four wheels and tires, each weighing approximately eighty-three pounds; and to do all of the other things necessary to disassemble the wheels and tires from the automobile. The decedent performed his work and, at 3:20 P.M., finished that work, then proceeded to clean his tools, wash himself, and comb his hair; thereafter he went to the rear door to await his wife. It is not questioned that the decedent performed his work on a day in which the temperature ranged from 85 to 91 degrees, and the humidity approximately 85 degrees. While waiting for his wife, decedent did engage in a conversation with his supervisor for about twenty minutes. During this entire time, the decedent did not complain of any pain or shortness of breath, nor did he give the appearance to his superintendent of being in ill health. At approximately 4:45 P.M., when the superintendent turned his back to go for some water, the decedent fell to the ground, and thereafter, within approximately twenty minutes, he was declared dead * * *.
"It is uncontradicted that decedent had a very diseased heart; did experience high blood pressure, and did work with these ailments for some period of time. The exact period of time has not been established.
"It is uncontradicted that decedent never complained of having any heart trouble, either to his employer, superiors, workers or to his family or friends. As a matter of fact, the record establishes that the only thing decedent ever complained of, as a possible ailment, were headaches and, a year prior to his death, of stomach ache pains, from which he told both his wife and his co-employee he got relief by sitting in a hot tub of water.
"The sole question presented is whether his death occurred as a result of the *207 natural development of the diseased heart, and other diseases from which he suffered, or whether his death was caused by the work which the decedent was performing in the heat and humidity which existed on the particular day in question.
"* * * All the experts agreed that exertion, such as the work which the decedent was performing on that date, the heat and humidity, would place an added strain on the circulation of the blood and, therefore, on the heart. Hence, the only question is whether that particular strain, all of the experts agreed did occur, did actually cause his death.
* * * * * *
"The Court is called upon to determine whether or not it is essential that one who ultimately dies from a heart condition must evidence symptoms of his condition prior to the time that he dies. If the Court finds that such symptoms are not necessarily important or should not be evidenced, then the Court logically must find that, since every expert testified the work decedent was doing at the time was an added strain, which could result in his death, the Court will necessarily have to find that his work did cause his death * * *.
"* * * the Court must of course look to the experts for full guidance. There have been seven experts offered. At first blush it would appear that the experts are in full disagreement; however, a more thorough examination of the testimony will reveal that they are not in full disagreement on the question before the Court. The following experts, Dr. Wascom, Dr. Labraudette, Dr. Welsh, and Dr. Halle have all unequivocally stated that it is their opinion that the death was caused by the strain put upon the heart, and the circulatory system, as a result of the work being performed by decedent, and the heat and humidity. They further stated that decedent would not necessarily have to display any signs or symptoms of pain at the time he first experienced his heart failure. As a matter of fact, these various experts stated there have been many instances where the person experiencing this type of heart attack or failure never did complain of any discomfort or pain, and it was repeatedly stated that certainly, even if he did experience some symptoms, the signs would not be such as to be detected by a lay person, but that there might be certain such symptoms which could be detected by an experienced physician in that field, if he had had an opportunity of interviewing the party experiencing the heart failure.
"All of the above physicians have stated that the heart arrest could and was, in this case triggered by exertion; that it was a gradually developing failure from the moment that it was triggered by the exertion until the decedent fell to the ground.
"* * * It appears that all of the experts called for the defendant, that is, Dr. Cummins and also Dr. Mayer, testified more from the expert's point of view, and when they referred to the fact that symptoms should occur, it is this Court's opinion that they viewed that situation from their expert opinion as to what symptoms they would have discovered. The Court asked each doctor, `What symptoms would you be looking for?' And they stated that hard breathing could be a symptom. Complaints of chest pain could be a symptom. The different doctors did agree that symptoms should have manifested themselves either during his work or immediately thereafter. But, it appears to this Court that the defendant's defense hangs on a very thin thread, and that thread is that merely the supervisor did not notice anything wrong with the decedent at the time that he was speaking with him. There is no evidence that this man really did not experience symptoms; as a matter of fact, the history of the decedent would indicate that he could experience such symptoms such as pain and having difficulty breathing, *208 without necessarily relating them to others; without perhaps being conscious of them himself because his previous heart condition was such as every doctor stated, he should have experienced those very same symptoms prior to this date, yet there is evidence in the record that he never did complain of pains or appear in any way ill to either his family, friends or co-workers."
Defendants rely on Danziger v. Employers Mutual Liability Ins. Co. of Wisconsin, 245 La. 33, 156 So.2d 468, in which a claimant was denied compensation for a paralytic stroke suffered as a result of an emotional trauma. In that case, the Supreme Court reiterated the general rule (applicable to the instant case), that, if work requires physical effort and exertion and an employee's heart or other organ fails or suffers functional impairment while the employee is engaged in the performance of his usual and customary duties, it is "an accident" within the compensation act, and it is not necessary for the employee to show the disabling injury was the result of unusual physical effort. This general rule was followed recently in Prater v. Liberty Mutual Ins. Co., La.App., 182 So.2d 805.
However, Defendants point out that certain limitations were placed on this rule in the Danziger case, supra, and contend these limitations prevent recovery in the instant case. We cannot agree with this conclusion. The two general "ground rules" in Danziger were the following: (1) Recovery in vascular disease cases is limited to those employees who perform manual labor. (2) It is essential to show by strong evidence that the disability was attributable entirely to the laborious work. Both tests have been met in the instant case. With regard to the first test, there is no question that deceased was performing manual labor within the scope of his employment. With regard to the second test, we agree with the holding of Prater v. Liberty Mutual Ins. Co., supra, that courts must look principally to the testimony of medical experts, in cases involving death or disability of an employee from heart attack, to determine whether there was a causal connection between employment activity and death or disability resulting from the heart attack. In the instant case the preponderance of the medical evidence is to the effect that there was a causal connection between the manual labor performed by the deceased and the heart attack which resulted in his death.
The judgment of the district court is affirmed; Defendants to pay all taxable costs on appeal.
Judgment affirmed.